## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMIE ALBRIGHT and JEFFREY ALBRIGHT, : | | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 08-4486 |
| NEW JERSEY TURNPIKE AUTHORITY and JUAN FAJARDO, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| LAURIE HELLER and STEPHEN HELLER, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 09-1445 |
| NEW JERSEY TURNPIKE AUTHORITY, NEW JERSEY STATE POLICE, and TROOPER JUAN FAJARDO, | : : | |

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on a motion for summary judgment filed by the Defendant New Jersey Turnpike Authority. Oral argument was heard on the motion on June 14, 2011, and the record of that proceeding is incorporated here. For the reasons expressed on the record that day, as well as those set forth below, the motion will be denied.

Background

This action arises as the result of an automobile accident on the New Jersey Turnpike. On October 18, 2007 at approximately 10:30 a.m., Plaintiff Laurie Heller was driving her Nissan Armada northbound from her home Ocean City, Maryland to New

York City to take a two-day cruise.  She was accompanied by friends Rina Thaler, who

sat in the front passenger seat, and Plaintiff Jamie Albright, who sat in the back seat

behind the driver.

At mile marker 13.4 on the New Jersey Turnpike, Defendant New Jersey State

Trooper Juan Fajardo was conducting stationary laser speed checks from an overpass.

Defendant Fajardo has testified that he twice clocked a black Mercedes Benz traveling

north at 81 miles per hour.  Fajardo therefore made a u-turn on the overpass and drove

down a ramp to pursue the Mercedes on the Turnpike.

At that time, Heller's vehicle was traveling in the left lane.  Fajardo came up

quickly on the Heller vehicle, with some overhead lights on, but no siren.  Heller began

to shift into the right lane so that the trooper could pass, but Fajardo simultaneously

attempted to pass the Heller vehicle on the right, so that both vehicles were moving right

at the same time.  Fajardo therefore moved back into the left lane, but ricocheted off the

center median into the Heller vehicle.  The Heller vehicle ended up rolling over three

times before coming to rest, and Fajardo's Troop Car 6812, allegedly owned by

Defendant New Jersey Turnpike Authority, traveled into the grass on the right side of

the highway.  Both Heller and Albright were transported to Cooper Hospital.

Jamie Albright has sued the New Jersey Turnpike Authority and Juan Fajardo,

alleging that Fajardo was negligent in the operation of his motor vehicle.  In Count One

of her Second Amended Complaint, Albright asserts that she "has in the past and

continues to expend monies and incur obligations for . . . medical care and treatment."

(Albright's Second Am. Comp. ¶ 25.)  In Count Two, Stephen Albright states a claim for

loss of consortium.

2

Laurie Heller has also sued Trooper Fajardo (Count I), the New Jersey Turnpike Authority (Count II), and the New Jersey State Police (Count III) for negligence, claiming losses for "severe and permanent injuries to her body," (Heller's Am. Comp. ¶ 16), pain and suffering, loss of earnings and earning capacity, and damage to her vehicle. (Heller's Am. Comp. ¶¶ 16-19; 22-25; 28-31.)  Stephen Heller has made a claim (Count IV) for loss of consortium.

This Court has jurisdiction over the instant matter under 28 U.S.C. § 1332, as the Plaintiffs are citizens of Maryland and the Defendants are citizens of New Jersey, and the amount in controversy exceeds $75,000.

Discussion

A.  <u>Summary Judgment Standard</u>

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

3

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

4

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

B.  New Jersey Tort Claims Act

Pursuant to the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:9-2(d),

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

There is a two-pronged standard for evaluating whether a plaintiff's injury constitutes a permanent loss of bodily function in order to recover for pain and suffering.  Brooks v. Odom, 696 A.2d 619, 622-24 (N.J. 1997).  First, a plaintiff must show objective evidence of a permanent injury, and second, a plaintiff must prove a permanent loss of a body function that is substantial.  Id.

Defendants have moved for summary judgment under the Tort Claims Act, arguing that Plaintiff Heller suffered neither an objective permanent injury caused by the accident nor a permanent loss of bodily function that is substantial, and further arguing that Plaintiff Albright's injuries did not result in a permanent loss of bodily function that is substantial.

C. Plaintiff Heller's injuries

Mrs. Heller was transported by ambulance from the accident scene to Cooper Hospital with right sided neck, arm, shoulder and upper back pain, as well as head pain. Plaintiff Heller's hospital discharge instructions indicate she suffered from a cervical strain and spasm. At the time of discharge from the hospital, doctors recommended pain medication and a soft collar. Her CT scans at the hospital were negative.

Within days after the accident, Mrs. Heller presented to her family doctor, Brook Ellen Rider, M.D. for care. Dr. Rider referred her for a course of physical therapy. On November 29, 2007, notes from Heller's physical therapy provider recorded her diagnosis as "Neck pain with cervical radiculopathy." Heller had reported having headaches from the back of the head and neck which prevented her from blow drying and performing involved hairstyling at work.

From December 2007 through October 2009, Heller was under the care and treatment of James Morgan, M.D., PhD., a neurologist, for the head and neck pain from the accident. In February 2009 and October 2009, she reported that the headaches originated at the back of her neck and radiated upwards, and they were worse on the days she worked. Dr. Morgan reviewed her MRI, which showed a small disc herniation at C5-6. Traction and the medication Neurontin did not cure the symptoms, so Dr. Morgan prescribed Percocet, cervical epidural steroid injections, and facet blocks.

In early 2008, Mrs. Heller tried a course of chiropractic care with Sean Williams, D.C., after which Dr. Williams opined the Mrs. Heller suffered a "structural injury" to her cervical spine as a result of the 10/18/2007 accident. Williams concluded that this injury resulted in a stretching and tearing injury of the supporting muscles and

6

ligaments, as well as localized nerve irritation.  Williams had taken into account that a

January 18, 2008 MRI of Heller's cervical spine revealed "minimal central disc

protrusion at C2-C3 but no evidence of significant spinal stenosis."  Williams' prognosis

was :

> Due to the altered alignment of the spine and the damage to the
> supporting tissue, healing will not be at an optimum.  In the years to come,
> the damage to the joints in [Heller's] spine may cause some scar tissue
> formation in the affected areas.  However, I feel the patient's prognosis
> with chiropractic treatment will be favorable providing treatment
> recommendations are followed.

An MRI conducted on January 19, 2009 showed a right lateral disc herniation

and a small left lateral disc herniation in the C5-C6 vertebrae, "new from the patient's

prior exam."  Defendants point out that the MRI performed on January 19, 2009

revealed "no abnormality" in the C2-C3 vertebrae.

When her neck pain continued, Heller sought more aggressive treatment with

Christopher Galuardi, M.D.  At that time, she had been taking Percocet sparingly at

night for her pain.  In January of 2009, Galuardi noted that Heller appeared to have

problems with the facet joints, occipital nerves, and cervical discs.  On February 10, 17,

and 24, 2010, Dr. Galuardi placed Heller under anesthesia for cervical epidural steroid

injections under fluoroscopy and cervical facet blocks.  A follow up visit on March 9,

2010 following these three procedures revealed:

> The patient had improvement from a cervical facet blocks and I assume
> that this is whiplash because she did not develop joint arthritis overnight
> and she has never had neck pain before.  The only thing that is different is
> the motor vehicle accident and therefore this is whiplash.

On February 15, 2010, Dr. Galuardi wrote:

The patient's current working diagnosis as a result of the MVA on 10/18/07 includes a bulging cervical disc at C2-3, which was diagnosed on an MRI performed 1/18/08. She also has a herniated disc at the C5-6 level, which was diagnosed on 1/19/09, and cervical spondylosis as a consequence of the disc hernia and whiplash. The basis for this diagnosis is the response to the cervical facet injection. She also has occipital neuralgia based on symptoms, which were described on 11/12/07. All opinions are expressed within a reasonable degree of medical certainty.

* * *

Within a reasonable degree of medical certainty, [Heller's] current condition is chiefly due to cervical spondylosis/whiplash and occipital neuralgia as a result of the motor vehicle accident of 10/18/2007. The disc hernias are also contributing to the issue with the spondylosis.

* * *

At this point, it has been two years and four months since her injury, and I feel that Mrs. Heller has sustained a permanent injury. She has had a loss of function as a hairstylist. She is unable to hold up her arms to work for long periods of time and this has necessitated giving up doing complex hairstyles and prolonged blow-drying of hair.

Heller last treated with Dr. Galuardi on April 29, 2011. The doctor's notes

following that examination reveal:

The patient underwent a cervical facet injection. She noted that it took several days to help but has decreased her neck pain. She still has limited range of motion and is having difficulty turning her head while driving and working. I consider this to be a permanent disability at this point.

* * *

Range of motion is 45° to the right and 60° to the left. Flexion is intact. The patient has lost the ability to extend at her neck. Sperling's test was positive on the left but negative on the right.

* * *

The patient now has a permanent partial disability in her neck as a result of the motor vehicle accident. I do not anticipate that her loss in range of motion will ever improve.

8

Heller has continued to work as a hairstylist, and she owns her own salon. She has testified that she works six days per week from open to close, and is on her feet for approximately eight hours each work day. Her main limitation at work is that she is unable to blow dry clients' hair when the hair is long. She therefore has hired an assistant do that. At work, Heller is also able to cut and color hair, sell products, wipe down sinks, wipe off shelves, purchase products to stock shelves, and fold towels. At home, Heller still takes care of her nine-year-old son, prepares meals, shops for groceries, does laundry, cooks, knits, and cleans her home. She went on a cruise to Alaska in August of 2009, and has been on other trips, having driven to New York from Maryland about twice a year to visit family. She has testified, however, that she no longer goes on bike rides, no longer camps, and she is unable to enjoy playing outside with her child. Heller also contends that she is limited in shopping and driving, and has decreased her social activity significantly because she tires easily.

D. Plaintiff Albright's injuries

Jamie Albright was transported to Cooper Medical Center from the accident scene. Mrs. Albright suffered from a left-sided pneumothorax, atelectasis, pulmonary contusions, displaced fractures of the angles or the left third, fourth, fifth and sixth ribs. According to her October 18, 2007 chest CT scan, she also suffered from a "nondisplaced fracture of the left transverse process of T2" and "disc space narrowing/endplate spur formation and irregularity at the levels of C5-6 and C6-7." Defendants acknowledge that Plaintiff Albright suffered serious injuries as a result of the accident. They argue, however, that all of the injuries were resolving themselves within ten days of the accident. A November 29, 2007 X-ray showed that Albright's ribs had partially healed.

A November 29, 2007 CT scan of her cervical spine showed "stable healing fracture of the left transverse process of T2" and "degenerative changes of the intervertebral disc spaces of the cervical spine." At that time, Albright showed "no evidence for pneumothorax" and "no evidence of fractures of the cervical vertebral bodies."

As of December 6, 2007, Mrs. Albright was still complaining of pain in the left arm and shoulder area. On January 3, 2008, she reported that her sternal and rib pain had recently resolved, but her back pain had since increased. Mrs. Albright realized some relief from physical therapy, but her back pain caused her physical therapist concern as of February, 2008. An MRI that month showed "a very small disc herniation at L5/S1," "very mild degenerative disc disease," and "mild compression anterior endplate of T12 of uncertain age."

In March of 2008, Mrs. Albright reported feeling much better. In April of 2008, she was able to play tennis and ride a stationary bike. She rated her back pain as 4 out of 10 at that time. She played tennis again in June of 2008, but reported being sore and unable to stand up straight the next day. In December of 2008, Mrs. Albright reported that she had been able to go on vacation with minimal to no back pain, but after playing a game of tennis, she experienced significant low back pain and soreness which she rated as 6 out of 10.

By April of 2009, Mrs. Albright had turned to an acupuncturist for relief from her middle back pain. A June 2009 MRI revealed "acute or subacute mild fracture involving T12" and concluded "L5-S1 small disc herniation centrally and to the left causes mild left lateral recess stenosis."

Mrs. Albright saw Philip J. Spinuzza, D.O., an orthopedist, on June 19, 2009 and July 10, 2009, complaining of pain, especially with any increased activity. Dr. Spinuzza

concluded that Albright had "been through an appropriate gamut of treatment."  At that time, Mrs. Albright's bone scan found "minimal focal areas of increased activity . . . in posterior mid left ribs."  After reviewing the bone scan results, Dr. Spinuzza related the positive findings to her rib fractures resulting from the accident and he opined that "in all likelihood this will be a chronic unremitting problem which periodically will flare." He also noted that, upon examination of her thoracic spine, Mrs. Albright continued to suffer from "midline tenderness at T4, T5, T6, T7 and T8" and "she has a moderate restriction of motion."  On September 4, 2009, Dr. Spinuzza wrote:

> [Mrs. Albright] is continuing to have persistent mid and lower back pain with radiation to the left ribs.  This interferes with activities of daily living that she previously enjoyed, including gardening.  She has pain with lifting her knee, spinning, twisting, etc, In addition, the pain has been quite frustrating because it frequently wakes her from sleep at night. . . .  Long-term prognosis is guarded.

On October 14, 2009, Mrs. Albright consulted with Christopher Galuardi, M.D, who is Board-Certified in Pain Management.  Dr. Galuardi noted that Mrs. Albright "has quite a bit of pain when he palpates the T12 area."  He prescribed another pain medication for her daily use and suggested she undergo thoracic facet injections and nerve blocks.  On November 2, 2009, Mrs. Albright was suffering from heavy and throbbing pain in her thoracic spine that was 10 out of 10 without medication, and exacerbated with any type of bending.  Dr. Galuardi "explained that the vertebral fracture from the car accident has caused problems with the facet joints and that is why she is having pain. [He] explained that this is a form of post accident traumatic arthritis."  At that time, Dr. Galuardi discussed the possibility of a rhizotomy, which is a severing of nerve roots in the spinal cord to relieve pain.  He also stated that he did "not anticipate that this condition will cure itself."

During Mrs. Albright's April 12, 2010 visit, upon physical examination of her

thoracic spine, Dr. Spinuzza found as follows:

> The examination of the thoracolumbar spine reveals an increased thoracic
> kyphosis at the level of T12. She is locally tender at the T12 level and the
> T12 paravertebral muscles. . . . She has pain with forward flexion at 40
> degrees, pain with extension at 10 degrees. She has pain with springing
> compression of the ribs.

Dr. Spinuzza opined at that time:

> I have advised Jamie that since it has been approximately two and a half
> years since her trauma that it is unlikely that she will improve with further
> time. She has been through an appropriate course of treatment and
> unfortunately she is still symptomatic. I agree with chronic pain
> management with Dr. Galuardi including intermittent fact and nerve block
> injections. She is on the appropriate dose of Trarnadol at this point in
> time. I have advised that it is unlikely that she would benefit from any
> type of spinal surgical procedure. Essentially, I have told Jamie that this is
> a condition that she will have to "learn to live with." If there is any change
> in her condition it is possible that additional treatments may be of some
> benefit.

> I have also advised Jamie that I believe that her current chronic pain
> condition is a direct result of the injuries which were sustained in the
> motor vehicle accident of 10/18/07. I have . . . encouraged her to be active
> within her tolerance and physical capability.

On June 12, 2010, Dr. Galuardi opined to a reasonable degree of medical

certainty that:

> The patient has sustained three injuries which are permanent and not
> expected to improve. These include the compression fracture at the T12
> vertebrae, the costochondritis which causes chest pain and the spondylosis
> of the thoracic spine which is causing spine pain in her back at the junction
> of the thoracic and lumbar spine. It is likely that her pain will remain the
> same throughout her life and require treatment. There is also a possibility
> that the spondylitic changes in the thoracic spine will worsen secondary to
> superimposed age-related degeneration and get worse.

> The patient's treatment has consisted of the pain medication tramadol due
> to her intolerance of anti-inflammatory drugs secondary to
> thrombocytopenia. In addition, she has undergone xray guided injections

into the thoracic spine joints and also the costochodral joints. I anticipate
that these treatments will need to be repeated once or twice a year for the
remainder of her life. The current cost of this treatment is $3000 per year.
Assuming that she lives an additional 30 years, and factoring in the cost of
medication, her lifetime expense will be approximately $100,000.

Mrs. Albright has testified that she can no longer perform many of the activities

she used to enjoy.  She can no longer work at her family's hotel and entertainment

center.  She used to sit in the office and take reservations and occasionally clean a hotel

room, but she cannot do that since the accident because of her pain.  She gets stiff if she

sits for more than an hour, she cannot stand for long periods of time, and she cannot

bend or lift.  Mrs. Albright explained that her "back feels like its too heavy for her body"

and she continues to suffer from mid- and lower back pain.  She played tennis regularly

before the accident, and worked out at a gym with a personal trainer.  She cannot do

those things now.  Mrs. Albright's pain also limits her in cooking, entertaining, and

gardening, activities she enjoyed before the accident.  Prior to the accident, Mrs.

Albright performed the housework and laundry in her home, but she has testified that

she has completely stopped doing those things since the accident.  She also has difficulty

sleeping and testified at her deposition that "when I lay down at night, I'm in constant

pain."

E.  Tort Claims Act Analysis

As stated above, the New Jersey Supreme "Court has established a two-pronged

test that a plaintiff must satisfy in order to collect pain and suffering damages under

N.J. Stat. Ann. § 59:9-2(d).  A plaintiff must show '(1) an objective permanent injury,

and (2) a permanent loss of a bodily function that is substantial.'" Knowles v. Mantua

Twp. Soccer Ass'n, 823 A.2d 26, 29 (N.J. 2003) (quoting Gilhooley v. County of Union,

753 A.2d 1137 (N.J. 2000) (citing Brooks v. Odom, 696 A.2d 619 (N.J. 1997))).

Defendants argue that Plaintiff Heller has not shown objective evidence of a permanent injury, nor can she prove a permanent loss of a body function that is substantial.  Although testing showed that Heller had a disc bulge at C2-C3 three months after the accident, Defendants take issue with the fact that her disc herniation at C5-C6 was not detected until one year and three months after the accident.  The fact is, however, that the record contains objective evidence of a disc herniation, Heller's physicians have linked the injury to the accident, and there is no explanation in the record of an intervening event that caused the disc herniation.  Therefore, the Court finds that Heller has presented proof of an objective, permanent injury sufficient to withstand summary judgment.

Turning to the argument that Heller is not permanently limited in a substantial function, the Court must undertake a fact-sensitive analysis.  Knowles, 823 A.2d at 30 (citing Gilhooley, 753 A.2d 1137).  "[I]t is the nature or degree of the ongoing impairment that determines whether a specific injury meets the threshold requirement under the Tort Claims Act."  Id. (quoting Ponte v. Overeem, 791 A.2d 1002 (N.J. 2002)).  "Where plaintiff's medical proofs support a claim of permanent injury that is based on objective evidence and not merely subjective complaints, such evidence raises an issue for the jury, and removes the case from the realm of summary judgment."  Gerber v. Springfield Bd. of Educ., 744 A.2d 670, 676 (N.J. Super. Ct. App. Div. 2000).  There is testimony that, among other activities, Heller is no longer able to blow dry clients' hair and she cannot raise her arms to complete updos.  For someone who has built a career as a hairdresser, these limitations are not insubstantial as a matter of law.  Therefore, there is enough evidence in the record for a jury to decide to what extent Mrs. Heller is impaired.

Defendants do not dispute that Plaintiff Albright has shown objective evidence of a permanent injury.  They argue instead that she is unable to prove a permanent loss of a body function that is substantial because she is still active, even though she is in pain. The New Jersey courts have stressed that the loss need not be total, but must be substantial.  "If the loss of bodily function is permanent and substantial . . . a plaintiff's eligibility to recover pain and suffering damages will not be defeated merely because she can perform some routine functions almost as well as she could prior to her injury." Kahrar v. Borough of Wallington, 791 A.2d 197, 204 (N.J. 2002).  Plaintiff Albright has shown objective, credible evidence of a permanent injury that a factfinder could reasonably find substantially limits her ability to perform many of the functions she previously enjoyed.  Therefore, summary judgment is inappropriate.

F.  Immunity

Next, Defendants argue that they are immune from liability under N.J. Stat. Ann. § 59:3-3 because Fajardo acted in good faith in enforcement of the law.  To meet the good faith standard for immunity under the Tort Claims Act, a public employee either must demonstrate that objective reasonableness or that he behaved with subjective good faith.  Toto v. Ensuar, 952 A.2d 463 (N.J. 2008).  The question of good faith generally presents a question of fact, Kelty v. State, Dep't of Law & Public Safety, Div. of State Police, 728 A.2d 273 (N.J. Super. Ct. App. Div. 1999), and reckless misconduct negates a claim of good faith.  N.J. Stat. Ann. § 59:3-14; Marley v. Borough of Palmyra, 473 A.2d 554 (N.J. Super. Ct. Law Div. 1983).

In 2002, the Appellate Division found that a genuine issue of material fact existed as to whether a police officer drove his car recklessly in responding to a burglary report

when it collided with a motorist's vehicle, and therefore summary judgment was precluded on the basis of good faith immunity for enforcement of the law.  In <u>Dunlea v. Township of Belleville</u>, 793 A.2d 888 (N.J. Super Ct. App. Div. 2002), the officer failed to activate his warning lights or siren when "abruptly" turning into oncoming traffic at a "fast" rate of speed.

Similarly, there is a genuine issue of material fact in this case as to whether the Defendant's actions were reckless.  As such, summary judgment will be denied. Plaintiffs' forensic expert Terence Fischer concluded that Fajardo was traveling at an excessive speed that did not allow him control his vehicle.  Plaintiffs' law enforcement expert Richard Jankowski concluded that Fajardo did not adhere to the "reasonable officer standard of care."  Moreover, the State Police investigation concluded that the subject accident was "preventable" in that "Fajardo, while in the course of his duties traveling at a high rate of speed to apprehend a speeding violator, could have reasonably prevented this event and will be held accountable."

Conclusion

For these reasons, as well as those discussed on the record at oral argument,

IT IS ORDERED on this 28th day of June, 2011 that the motion for summary judgment filed by the Defendant New Jersey Turnpike Authority is hereby <u>DENIED</u>.


 /s/ Joseph H. Rodriguez 
JOSEPH H. RODRIGUEZ
U.S.D.J.

16